IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

Plaintiff,

vs.                                    No. **CR 01-1583 BB (MCA)**

SARENA JOYCE PEREA,

Defendant.

## MEMORANDUM OPINION AND ORDER
## GRANTING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

**THIS MATTER** came before the Court on Defendant's Motion to Suppress Physical Evidence and Statements filed on December 3, 2001. The Court held an evidentiary hearing on Defendant's motion in Las Cruces, New Mexico, on December 20, 2001. Having fully considered the pleadings filed by the parties, the applicable law, as well as the evidence and arguments of counsel presented at the hearing, and being fully advised in the premises, the Court now GRANTS Defendant's motion based upon the following findings of fact and conclusions of law.

### I. **FINDINGS OF FACT**

1. Interstate 10 is an interstate highway that provides a direct route between Tucson, Arizona, and Deming, New Mexico, before reaching Interstate 25 near Las Cruces, New Mexico.



2. Interstate 25 is an interstate highway that begins near Las Cruces and passes by Hatch, New Mexico, before intersecting with Interstate 40 near Albuquerque, New Mexico.

3. New Mexico Highway 26 is a paved, two-lane state highway that provides a direct route between Deming and Hatch.

4. While it is possible to travel between Deming and Hatch using Interstate 10 and Interstate 25, Highway 26 provides a more direct route of motor-vehicle travel between the Interstate 10 exit at Deming and the entrance to Interstate 25 near Hatch.

5. Interstate 10, Interstate 25, and Highway 26 are frequently used for smuggling illegal aliens and drugs. These highways also are frequently used for legitimate travel.

6. Some of the recent smuggling activity on Highway 26 originates from staging areas in Arizona, and some of the recent smuggling activity on Highway 26 originates from other states.

7. The United States Border Patrol operates fixed checkpoints on Interstate 10 between Deming and Las Cruces, and on Interstate 25 between Las Cruces and Hatch. Travelers may avoid both of these checkpoints by exiting the eastbound lanes of Interstate 10 at Deming, traveling on Highway 26, and entering the northbound lanes of Interstate 25 near Hatch.

8. During the early-morning hours before sunrise, local traffic on Highway 26 typically consists of milk trucks from a nearby dairy, a newspaper-

delivery vehicle, cattle trucks, and local ranch vehicles; however, other legitimate travelers use Highway 26 at these hours as well, including travelers in vehicles with out-of-state license plates. Vehicles from southwestern states, including Arizona, are more commonly seen on Highway 26 than vehicles from other regions.

9. While parked on the shoulder of New Mexico Highway 26 near Nutt, New Mexico, on Friday, August 17, 2001, at about 2:15 a.m., United States Border Patrol Agent Christopher Dooley observed an eastbound vehicle pass by him.

10. In sworn testimony at the suppression hearing, Agent Dooley testified that he could not recall whether or not his vehicle headlights were "on" at the time he observed the eastbound vehicle pass by him.

11. Agent Dooley testified that he observed the eastbound vehicle with the aid of a flashlight as it passed by him at approximately sixty-five miles per hour.

12. Agent Dooley observed that the eastbound vehicle was a white minivan with Arizona license plates and that the vehicle contained two visible occupants in the front seats.

13. The minivan was not dirty and had windows on all sides. Agent Dooley testified that he could see into the vehicle's passenger compartment at night with the aid of his flashlight.

14. Although Agent Dooley testified that the minivan appeared to be riding "low near the ground" and "tilted in the rear section" when it passed him, the Court does not find this testimony to be credible given that:

a. Agent Dooley was observing the minivan in darkness with the aid of a flashlight as it passed his stationary vehicle at approximately sixty-five miles per hour; and

b. subsequent field testing after the minivan was seized showed that the minivan was carrying a cargo weighing approximately 260 pounds and that such cargo caused the minivan to ride only one and one-half inches lower at its rear wheel well.

15. After observing the minivan pass by him, Agent Dooley started his vehicle and followed the minivan eastbound on Highway 26 for eleven miles.

16. While following the minivan, Agent Dooley performed a records check to identify the minivan's registered owner and determine whether the minivan had recently crossed the border from Mexico or was reported as stolen.

17. The results of a records check performed by Agent Dooley indicated to him that the minivan was owned by Enterprise Leasing Company in Tucson, Arizona, and had not crossed the border within the previous seventy-two hours.

18. Agent Dooley testified that a rental van traveling from Tucson on Highway 26 at 2:15 a.m. which looks like it might have cargo in the back is suspicious and that he would have stopped any rental van which had Arizona license plates and was "riding low" as it passed by him on Highway 26 at that time of night.

19. Agent Dooley did not observe any suspicious behavior by the minivan's occupants while it passed by him or while he was following the minivan.

20. After receiving the results of the records check, Agent Dooley stopped the minivan at Mile Marker 39 on Highway 26 near Hatch, New Mexico, approximately fifty-five air miles north of the international border.

21. Two other agents of the United States Border Patrol also were present in another vehicle when Agent Dooley stopped the minivan.

22. At the time of the stop, Sarena Joyce Perea (Defendant) was in the driver's seat of the minivan and Kenneth Michael Taylor was in the front passenger seat. Agent Dooley approached the driver's-side window of the minivan, identified himself as an agent of the Border Patrol, and asked Defendant and Mr. Taylor to identify their citizenship; both individuals stated that they were United States citizens.

23. After questioning the minivan's occupants regarding their citizenship, Agent Dooley requested information regarding the minivan's ownership. Defendant stated that the vehicle was a rental, and one of the minivan's occupants produced a rental agreement.

24. While questioning the minivan's occupants, Agent Dooley observed for the first time several duffel bags and suitcases in the back of the minivan.

25. After questioning the minivan's occupants about the minivan's ownership, Agent Dooley requested Defendant's consent to perform a canine inspection of the minivan.

26. The minivan's occupants were not free to leave when Agent Dooley questioned them and observed the luggage in the back of the minivan.

27. Agent Dooley testified that Defendant consented to the canine inspection of the minivan, whereupon Agent Dooley instructed Defendant and Mr. Taylor to exit the minivan while he performed the canine inspection.

28. Agent Dooley performed a canine inspection and his dog alerted at the rear of the minivan near the seam between the two rear doors.

29. After the dog alerted to the rear of the minivan, Agent Dooley opened the side door of the minivan and allowed the dog to enter the minivan. Upon entering the minivan, the dog alerted again to the luggage in the back of the minivan and Agent Dooley observed a clear cellophane material in an opening in one of the suitcases.

30. Subsequent field tests revealed that the contents of the luggage in the minivan consisted of approximately 260 pounds of marijuana.

## II. LEGAL ANALYSIS AND CONCLUSIONS OF LAW

### A. Reasonableness of the Stop

The question before the Court is whether it is reasonable for the government to stop a rental minivan with Arizona license plates traveling in the early morning hours before sunrise on New Mexico Highway 26 with two visible occupants and cargo that causes the minivan to ride approximately one and one-half inches lower at its rear wheel well. For the following reasons, the Court concludes that the answer to this question is no.

The Fourth Amendment to the United States Constitution protects Defendant's right to be secure in her person and effects against unreasonable

searches and seizures. "[A]utomobiles are 'effects' under the Fourth Amendment, and searches and seizures of automobiles are therefore subject to the constitutional standard of reasonableness." United States v. Chadwick, 433 U.S. 1, 12 (1977), overruled in part on other grounds, California v. Acevado, 500 U.S. 565 (1991).

Although a person who asserts neither a possessory interest nor a property interest in a vehicle may lack standing to directly contest the search of that vehicle, see Rakas v. Illinois, 439 U.S. 128, 148-49 (1978), Defendant nevertheless has standing to challenge the initial stop of the minivan that resulted in her detention, see United States v. Shareef, 100 F.3d 1491, 1500 (10th Cir. 1996). If Defendant's detention is unlawful, then the evidence obtained as a result of that detention must be suppressed unless it was obtained by "means sufficiently distinguishable to be purged of the primary taint" of the unlawful detention. Wong Sun v. United States, 371 U.S. 471, 487-88 (1963); see United States v. Erwin, 875 F.2d 268, 269 n.2 (10th Cir. 1989).

The government bears the burden of proving the reasonableness of Agent Dooley's warrantless search and seizure of the minivan driven by Defendant. See United States v. Maestas, 2 F.3d 1485, 1491 (10th Cir. 1993). In order to be considered "reasonable" under the Fourth Amendment, a Border Patrol agent's use of a roving patrol to stop a vehicle traveling on Highway 26 must be based upon a reasonable suspicion that the vehicle's occupants may be involved in criminal activity, and the scope of the stop must be limited to a brief investigation

of the circumstances that provoked the agent's suspicion. See United States v. Brignoni-Ponce, 422 U.S. 873, 881 (1975). The Fourth Amendment permits a Border Patrol agent who has stopped a vehicle based upon such a reasonable suspicion to ask the driver and any passengers to provide information about their identities and citizenship, respond to objectively reasonable concerns about the agent's safety, and explain suspicious circumstances, "but any further detention or search must be based on consent or probable cause." Id. at 881-82I; see generally United States v. Holt, 264 F.3d 1215, 1220-26, 1228-30 (10th Cir. 2001) (en banc).

The factors that Agent Dooley properly may have considered in determining whether there was reasonable suspicion to stop the minivan driven by Defendant include: (1) the characteristics of the geographic area in which he encountered the minivan, such as its proximity to the border, the usual patterns of traffic through the area, and previous experience with smuggling or other illegal activity in the area; (2) information about recent illegal border crossings; (3) aspects of the driver's appearance and behavior, such as erratic driving or obvious attempts to evade detection; (4) aspects of the minivan itself, such as the appearance of being heavily loaded or the presence of large, hidden compartments that are frequently used for concealing illegal activity; and (5) the number, appearance, and behavior of any passengers in the vehicle. See Brignoni-Ponce, 422 U.S. at 884-85. Agent Dooley also may have considered such other facts as are meaningful to him in light of his experience detecting illegal entry and smuggling. See id. at 885.

Determining the reasonableness of the suspicion that prompted Agent Dooley to stop the minivan driven by Defendant does not depend on any one of these factors, nor was Agent Dooley required to identify a minimum number of factors to establish reasonable suspicion. See United States v. Lopez-Martinez, 25 F.3d 1481, 1484 (10th Cir. 1994). Rather, the Court must consider the totality of the circumstances. See id. "In examining the totality of the circumstances, '[c]ommon sense and ordinary human experience are to be employed,' and 'deference is to be accorded to a law enforcement officer's ability to distinguish between innocent and suspicious actions.'" United States v. De La Cruz-Tapia, 162 F.3d 1275, 1277 (10th Cir. 1998) (quoting United States v. Wood, 106 F.3d 942, 946 (10th Cir. 1997)). Reasonable suspicion may be based on "'a series of acts, each of them perhaps innocent in itself, but which taken together warranted further investigation.'" Lopez-Martinez, 25 F.3d at 1484 (quoting Terry v. Ohio, 392 U.S. 1, 22 (1968)).

An agent cannot, however, predicate a vehicle stop solely upon a hunch, see De La Cruz-Tapia, 162 F.3d at 1277, or rely solely upon generic facts that are so innocent or susceptible to varying interpretations as to be innocuous, see Wood, 106 F.3d at 946. Although it is "possible for individually innocuous factors to add up to reasonable suspicion, it is 'impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation.'" Id. at 948 (quoting Karnes v. Skrutski, 62 F.3d 485, 496 (3d Cir. 1995)).

In this case, the Government relies primarily on generic facts about the characteristics of the area in which Defendant was traveling and information about recent smuggling activity in that area. Agent Dooley testified that smugglers sometimes pick up illegal aliens or drugs from "staging areas" inside the United States, that smugglers sometimes use the cover of darkness to conceal their illegal activity, and that New Mexico Highway 26 is sometimes used as a smuggling route due to its proximity to the border with Mexico, its remoteness, and its lack of fixed Border Patrol checkpoints. While these generic facts are entitled to some consideration in the Court's analysis, standing alone they do not provide reasonable suspicion for Border Patrol agents to stop every vehicle that travels on Highway 26 while it is dark. Cf. United States v. Miranda-Enriquez, 941 F.2d 1081, 1084 (10th Cir. 1991) (concluding that use of a known smuggling route by a vehicle with Arizona license plates did not establish reasonable suspicion of criminal activity when that route also was frequented by legitimate travelers); United States v. Sanders, 937 F.2d 1495, 1501 (10th Cir. 1991) ("The fact that Defendant was traveling in the middle of the night on a busy interstate highway can not, by itself, create suspicious circumstances that can lead to an objectively reasonable suspicion that something is wrong.").

Agent Dooley also testified that he observed some characteristics of the minivan driven by Defendant that he considered to be suspicious, namely its Arizona license plates, the fact that it was a rental vehicle, and its appearance of riding "low to the ground." The Court concludes, however, that these observations

add little or nothing of probative value to the analysis of the totality of the circumstances, because they are insufficiently particularized or objective. See United States v. Cortez, 449 U.S. 411, 417-418 (1981) (concluding that reasonable suspicion requires "a particularized and objective basis"). The fact that the minivan had Arizona license plates does not carry much weight in this instance given Agent Dooley's testimony that vehicles with license plates from other states also may be suspicious, that legitimate travelers from Arizona also use Highway 26, and that most out-of-state traffic on that route is from southwestern states. See United States v. Martinez-Cigarroa, 44 F.3d 908, 911 (10th Cir. 1995) (concluding that out-of-state license plates in and of themselves are "not significantly probative of illegal activity" and add "little to the reasonable suspicion equation"). Evidence that the minivan was a rental vehicle does not add significantly to the Court's analysis because Agent Dooley testified that drugs are more often found in non-rental vehicles, and the fact that rental vehicles are less common than non-rental vehicles is innocuous. See Wood, 106 F.3d at 947 (concluding that a driver's unusual travel plan, including his use of a rental vehicle for a one-way trip from California to Kansas, did not give rise to a reasonable suspicion of criminal activity). And while the Court finds Agent Dooley to be a credible and professional agent in other respects, the Court does not give credence to his testimony that the minivan was riding suspiciously "low to the ground" when it passed him because Agent Dooley's observation of that characteristic is contradicted by subsequent field-testing, which provides an

objective basis for concluding that the minivan was not riding significantly lower in the rear than one would reasonably expect for that type of vehicle when it is carrying two occupants and their luggage on an interstate trip.

The Court finds it significant that the Government did not identify any suspicious circumstances relating to the minivan's occupants that were observed prior to the stop. In particular, Agent Dooley did not observe any erratic or evasive behavior by the driver and he only observed a single passenger who made no attempt to hide. Agent Dooley further testified that he could not identify the race of the minivan's occupants or any details of their appearance that would suggest they were coming from Mexico when they passed him. Cf. Brignoni-Ponce, 422 U.S. at 884-85 (considering aspects of the driver's appearance and behavior, as well as the number, appearance, and behavior of the vehicle's passengers).

The Tenth Circuit has concluded that "the essential factor" which authorizes roving Border Patrol agents to stop vehicles based upon reasonable suspicion rather than the more stringent requirement of probable cause is "the hypothesis that the person or object searched has come from outside the country." United States v. Venzor-Castillo, 991 F.2d 634, 638 (10th Cir. 1993). Evidence to support such a hypothesis is lacking in this case.

Agent Dooley's records check indicated the minivan had not made a lawful border crossing within seventy-two hours prior to the stop, and he testified that he did not consider this fact to be suspicious. The records check also indicated

that the minivan was a rental vehicle from Tucson, Arizona, and had not been reported as stolen. The minivan was well-maintained and did not have the appearance of recently being driven on an unpaved roadway. There was no evidence that the minivan was traveling a circuitous or implausible route from Tucson which would suggest a detour to the border with Mexico. On the contrary, Highway 26 provides a plausible and direct route for legitimate travel from southern Arizona to Albuquerque and other populated areas along Interstate 25 north of Hatch. It is equally plausible that interstate travelers may wish to travel at night for legitimate reasons, such as to avoid the hot temperatures that occur in the desert during the summer months or to make more efficient use of the time during which they are incurring fees for renting a vehicle.

For these reasons, the evidence presented by the Government does not support a rational inference that all travelers in rental vehicles from southern Arizona on Highway 26 during the early morning hours before sunrise are so likely to be engaged in illegal activity as to justify being stopped by roving Border Patrol agents. Accordingly, the Court concludes that the Government has not met its burden of proving that Agent Dooley's stop of the minivan and its occupants was reasonable under the Fourth Amendment. Considering the totality of the circumstances, the factors identified by Agent Dooley in this case are not sufficiently particularized and objective to establish a reasonable suspicion of criminal activity. Therefore, the investigative detention of the minivan and its occupants was unlawful.

B. Suppression of the Evidence

The Court next addresses whether the physical evidence and statements obtained after the initial stop of the minivan must be suppressed as "fruit of the poisonous tree." See Wong Sun, 371 U.S. at 487-88. The Government contends that the evidence and statements were obtained by "'means sufficiently distinguishable to be purged of the primary taint'" of the unlawful detention, id., because Defendant allegedly consented to Agent Dooley's canine inspection of the minivan. Defendant contends, on the other hand, that her consent was coerced and that the search of the minivan was tainted by the unlawfulness of the stop which preceded it.

In determining whether Defendant's consent and the ensuing search of the minivan are tainted by the unlawful detention, the Court considers the temporal proximity between the unlawful detention and the consent to the canine inspection, the presence of intervening circumstances, and the purpose or flagrancy of the official misconduct. See Brown v. Illinois, 422 U.S. 590, 603-04 (1975); United States v. Melendez-Garcia, 28 F.3d 1046, 1054 (10th Cir. 1994). When a consensual search is preceded by a Fourth Amendment violation, "the government [must] show that consent is voluntary in fact," and "it must also demonstrate a break in the causal connection between the illegality and the" evidence thereby obtained. Id.

In this instance, Agent Dooley's request to perform a canine inspection occurred immediately after he questioned the minivan's occupants about its

ownership and their citizenship. Such questioning was the foreseeable, planned outcome of the unlawful detention. There is no credible evidence that Defendant was free to leave at the time her consent was requested, and there were no intervening circumstances that would indicate a break in the causal connection between the initial detention and the search that followed it. Accordingly, the Court concludes that the incriminating evidence and statements were a product of the illegal stop and must be suppressed.

**IT IS, THEREFORE, ORDERED** that Defendant's Motion to Suppress Physical Evidence and Statements be and hereby is **GRANTED**.

Dated in Albuquerque this 28th day of December, 2001.

**M. CHRISTINA ARMIJO**
United States District Judge

Counsel for the Government:
   **Richard C. Williams**
   Special Assistant U.S. Attorney
   Las Cruces, New Mexico

Counsel for Defendant:
   **Barbara A. Mandel**
   Assistant Federal Public Defender
   Las Cruces, New Mexico